Joseph M. Alioto (SBN 42680)
ALIOTO LAW FIRM
555 California Street, Suite 3160
San Francisco, CA 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200

Attorney for Plaintiffs
[ADDITIONAL COUNSEL APPEAR ON LAST PAGE]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDEN GATE PHARMACY SERVICES, INC., d/b/a GOLDEN GATE PHARMACY, JAMES CLAYWORTH, R.Ph., MARIN APOTHECARIES, d/b/a ROSS VALLEY PHARMACY, PEDIATRIC CARE PHARMACY, INC., TONY MAVRANTONIS, R.Ph., JOHN O'CONNELL, R. Ph, and TILLEY APOTHECARIES, INC., d/b/a ZWEBER'S APOTHECARY, <br><br> Plaintiffs, <br><br> v. <br><br> PFIZER, INC., WYETH <br><br> Defendants. | **Case No. CV-09-3854-MMC** <br><br> **SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATION OF THE ANTITRUST LAWS OF THE UNITED STATES** <br><br> **JURY TRIAL DEMANDED** |

The plaintiffs, retail pharmacies in California who purchase drugs directly or indirectly from the defendants, bring this action under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. Sections 15, 26, for damages, divestiture, and an injunction prohibiting further violations of Section 1 of the Sherman Act, 15 U.S.C. Section 1, and Section 7 of the Clayton Act, 15 U.S.C. Section 18, arising from and out of the anti-competitive combination of the defendants, and demand trial by jury, and complain and allege as follows:

1.      This action is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. Sections 15, 26, to secure damages for and injunctive relief against the defendants by reason of

their violations of Section 7 of the Clayton Antitrust Act, 15 U.S.C. Section 18, and Section 1 of the Sherman Act, 15 U.S.C. Section 1.  This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. Sections 15, 26, and Title 28 United States Code Sections 1331 and 1337.

2.       Each of the plaintiffs named in this Complaint has purchased drugs, directly or indirectly, from one or both of the defendants and each plaintiff expects to continue to purchase drugs from one or both of the defendants or their merged entity in the future.

3.       Plaintiff Golden Gate Pharmacy Services, Inc. d/b/a Golden Gate Pharmacy is a California corporation managed by Rebecca Lofholm, R.Ph, with its principal place of business at 2165 E. Francisco Boulevard, Suite A-2, San Rafael, California 94901.

4.       Plaintiff James Clayworth, R.Ph., is a resident doing business as Clayworth Pharmacy and Clayworth Healthcare, 20353 Lake Chabot Road, Suite 101, Castro Valley, California 94546.

5.       Plaintiff Marin Apothecaries, Inc. d/b/a/ Ross Valley Pharmacy, is a California corporation managed by Paul Lofholm, R.Ph, with its principal place of business at 2 Bon Air Road, Larkspur, California 94939.

6.       Plaintiff Pediatric Care Pharmacy, Inc. is a California corporation, managed by Tom Liautaud, R.Ph., with its principal place of business at 4616 Delongpre Avenue, Los Angeles, California 90027.

7.       Plaintiff Tony Mavrantonis, R. Ph. is a California resident doing business as Jack's Drug, 121 Tunstead, San Anselmo, California 94960.

8.       Plaintiff John O'Connell, R. Ph, is a California resident who has purchased drugs, directly or indirectly from one or both of the defendants and expects to continue to purchase drugs from one or both of the defendants or their merged entity in the future.

9.       Plaintiff Tilley Apothecaries, Inc. d/b/a Zweber's Apothecary is a California corporation, managed by John Tilley, R.Ph, with its principal place of business at 11411 Brookshire Ave, Downey, California 90241.

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

10.     Defendant Pfizer is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York 10017.  Pfizer is the world's largest drug maker.  In 2008, Pfizer had revenues of $48.3 Billion, net income of $8 Billion, stockholder equity of $57 Billion, assets of $111 Billion, and paid dividends of $8.5 Billion.

11.     Pfizer is engaged, *inter alia*, in the research, development, manufacture, distribution, and sale of pharmaceutical products.  According to the Chairman and CEO of Pfizer, by reason of the combination with Wyeth, the combination "will lead in nearly <u>every</u> dimension of bio-pharmaceuticals and in almost <u>all</u> of the world's major markets.  In addition, Pfizer brags that the "Pfizer-Wyeth will <u>cement</u> our leadership in major markets:  #1 in USA, in Japan, in Asia, in Europe, in Latin America."

12.     Defendant Wyeth, formerly known as American Home Products Corporation, is a Delaware corporation with its principal place of business at 5 Giralda Farms, Madison, New Jersey 07940.  In 2008, Wyeth had revenues of $22.8 Billion, net income of $4.4 Billion and 47,500 employees.

13.     Wyeth is engaged, *inter alia*, in the research, development, manufacture, distribution, and sale of pharmaceutical products.

14.     Bank of America, CitiGroup, Goldman Sachs, and JP Morgan Chase are co-conspirators of the violations alleged in that they actively participated in, knew and understood the violations, made statements and acted in furtherance of the violations, and aided and abetted in the violations.

15.     On January 26, 2009, the defendant Pfizer agreed to acquire the defendant Wyeth for $68 Billion.

16.     Pfizer is the largest pharmaceutical manufacturer in the United States and in the world.

17.     Wyeth is the fourth largest pharmaceutical manufacturer in the United States.

18.     The combination of Pfizer and Wyeth will result in the largest pharmacuetical acquisition/merger in history of the United States.

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

19.    The combination of Pfizer and Wyeth will result in the largest pharmaceutical company in the world.

20.    The combination of Pfizer and Wyeth will be at least two times larger than the next largest pharmaceutical company in the United States.

21.    Pfizer was not and is not a failing company.

22.    Wyeth was not and is not a failing company.

23.    Pfizer competes with Wyeth in the manufacture and sale of pharmaceutical products.

24.    Wyeth competes with Pfizer in the manufacture and sale of pharmaceutical products.

25.    Pfizer is an actual competitor of Wyeth in the manufacture and sale of pharmaceutical products.

26.    Wyeth is an actual competitor of Pfizer in the manufacture and sale of pharmaceutical products.

27.    Pfizer is a potential competitor of Wyeth in the manufacture and sale of pharmaceutical products.

28.    Wyeth is a potential competitor of Pfizer in the manufacture and sale of pharmaceutical products.

29.    Pfizer has the wherewithal as a potential competitor of Wyeth in the manufacture and sale of pharmaceutical products manufactured and sold by Wyeth, but not yet manufactured and sold by Pfizer.

30.    Wyeth has the wherewithal as a potential competitor of Pfizer in the manufacture and sale of pharmaceutical products manufactured and sold by Pfizer, but not yet manufactured and sold by Wyeth.

31.    The actual competition of Pfizer against Wyeth had an impact on the pricing by Wyeth in the sale of its pharmaceutical products.

32.    The actual competition of Wyeth against Pfizer had an impact on the pricing by Pfizer in the sale of its pharmaceutical products.

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

33.     The potential competition of Pfizer against Wyeth had an impact on the pricing by Wyeth in the sale of its pharmaceutical products.

34.     The potential competition of Wyeth against Pfizer had an impact on the pricing by Pfizer in the sale of its pharmaceutical products.

35.     Pfizer was an actual competitor of Wyeth in the research and development and innovation of new pharmaceutical products.

36.     Wyeth was an actual competitor of Pfizer in the research and development and innovation of new pharmaceutical products.

37.     All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to pharmaceutical products requiring a prescription.

38.     All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to branded pharmaceutical products, including over-the-counter pharmaceutical products as well as prescription pharmaceutical products.

39.     All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to what Pfizer described as "other primary" pharmaceutical products.

40.     All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to what Pfizer described as "urological" products.

41.     All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to what Pfizer described as "central nervous system" products.

42.     All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to what Pfizer described as "cardiovascular" products.

43.     All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to what Pfizer described as "capsugel" products.

44.     All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to what Pfizer described as "oncological" products.

45.     All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to what Pfizer described as "animal health" products.

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

46.   All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to what Pfizer described as "consumer" products.

47.   All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to what Pfizer described as "nutritional" products.

48.   All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to what Pfizer described as "inflammation" products.

49.   All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to what Pfizer described as "infectious disease" products.

50.   All of the actual and potential competition between Pfizer and Wyeth enumerated above also applied to what Pfizer described as "other specialty" products.

51.   All of the products included in the category descriptions by Pfizer listed above were known by Wyeth and manufactured and sold by Wyeth in competition with Pfizer as an actual and as a potential competitor.

52.   The prices charged by Pfizer for its pharmaceutical products has a direct effect and impact upon the prices charged by Wyeth for its products, whether they are direct substitutes or not.

53.   The prices charged by Wyeth for its pharmaceutical products has a direct effect and impact upon the prices charged by Pfizer for its products, whether they are direct substitutes or not.

54.   Wyeth considers the prices charged by Pfizer for pharmaceutical products when Wyeth sets its prices for its pharmaceutical products, whether they be substitute therapies or not.

55.   Pfizer considers the prices charged by Wyeth for pharmaceutical products when Pfizer sets its prices for its pharmaceutical products, whether they be substitute therapies or not.

56.   One of the reasons for the anti-competitive combination of Pfizer and Wyeth was to "cement" and maintain Pfizer's dominance as the largest pharmaceutical company in the United States, Japan, Asia, Europe, and Latin America.

57.   One of the principle reasons for Pfizer's combination with Wyeth was the concern of Pfizer investors of the expected loss of exclusivity for Pfizer's Lipitor product in 2011.

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

58.     Before the consummation of the combination of Pfizer and Wyeth, the Chairman of the Board and Chief Executive Officer of Pfizer, Jeff Kindler, and the Chairman of the Board and Chief Executive Officer of Wyeth, Bernard Poussot, met and discussed the possibility of the combination.

59.     In those discussions, Messrs. Kindler and Poussot discussed the stabilization and/or increase of revenues and prices.

60.     In those discussions, Messrs. Kindler and Poussot discussed the firing of thousands of employees.

61.     The $68 Billion combination cost was supported by loans of $22.5 Billion of loans from major financial institutions.

62.     These financial institutions included Bank of America, Citigroup, Goldman Sachs, and JP Morgan Chase.

63.     Each of those financial institutions listed in the paragraph above received money from the United States Treasury Department under the so-called TARP program in the amount of $120 Billion.

64.     Each of those financial institutions knew that the TARP funds were meant to create jobs, increase competition, and aide consumer purchases by the lowering of prices, especially in the healthcare industry.

65.     Each of those financial institutions, however, knew that their loan to Pfizer for the combination of Pfizer Wyeth would result in the loss of thousands of jobs and increased prices.

66.     Pfizer told one or more of these financial institutions that one of the results of the combination with Wyeth would be the increase and/or stabilization of prices and/or revenues.

67.     Pfizer told one or more of these financial institutions that one of the results of the combination with Wyeth would be the loss of thousands of jobs.

68.     Wyeth told one or more of these financial institutions that one of the results of the combination with Pfizer would be the increase and/or stabilization of prices and/or revenues.

69.     Wyeth told one or more of these financial institutions that one of the results of the combination with Pfizer would be the loss of thousands of jobs.

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

70.     After the combination of Pfizer and Wyeth was consummated, Pfizer and Wyeth announced the intention to raise prices.

71.     After the combination of Pfizer and Wyeth was consummated, Pfizer and Wyeth announced the intention to shut down research and development facilities.

72.     After the combination of Pfizer and Wyeth was consummated, Pfizer and Wyeth announced the intention to fire thousands of employees.

73.     The purpose, motive and intent of the combination was to eliminate competition between Pfizer and Wyeth in the manufacture, sale and innovation of pharmaceutical products, both prescription and over-the-counter.

74.     The purpose, motive and intent of the combination was to increase prices for pharmaceutical products, whether prescription or over-the-counter.

75.     The effect of the combination was the elimination of competition between Pfizer and Wyeth.

76.     The effect of the combination was the increase in prices for pharmaceutical products, whether prescription or over-the-counter.

77.     By reason of the anticompetitive conduct of Pfizer and Wyeth, the plaintiffs will pay more for pharmaceutical products than they otherwise would.

78.     By reason of the anticompetitive conduct of Pfizer and Wyeth, the plaintiffs are deprived of newer and innovative products than they otherwise would have.

79.     Prior to the combination, the chief executive officers of Pfizer and Wyeth met with the chief executive officers of other pharmaceutical companies once a month on the average.

80.     The meetings of the chief executive officers of Pfizer and Wyeth between themselves and among the other chief executive officers of the other pharmaceutical companies gave them an opportunity to combine and conspire to eliminate competition, increase prices and thwart innovation.

81.     On October 15, 2009, pursuant to their announcement, the defendants closed and consummated their merger.

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

82.     The effect of the combination of defendants may be to lessen competition or to tend to create a monopoly, and has already lessened competition and tended to create a monopoly, in numerous markets and submarkets identified involving the manufacture and sale of pharmaceuticals and involving research, development, and innovation with respect to pharmaceuticals.

83.     Plaintiffs have purchased drugs from one or both of the defendants in the past, and expect to continue to do so in the future.

84.     Plaintiffs are threatened with loss or damage by defendants' merger in violation of Section 7 of the Clayton Act and Section 1 of the Sherman Act in the form of higher drug prices, reduced consumer choice, and diminished quality.

85.     The combination of Pfizer and Wyeth may substantially lessen competition and tend to create a monopoly in the manufacture, sale and innovation of pharmaceutical products, both prescription and over-the-counter, in the United States.

86.     Defendants Pfizer and Wyeth compete in what they describe to be the pharmaceutical industry which includes, but is not necessarily limited to, the following submarkets:  manufacture, sale and innovation of all pharmaceutical products, prescription pharmaceutical products, non-prescription pharmaceutical products, brand name pharmaceutical products and particular pharmaceutical products and therapies specifically noted and identified by Pfizer and Wyeth in their annual reports.

87.     The markets for the manufacture, sale and innovation of pharmaceutical products in general, and the sub-markets listed above and in the annual reports of the defendants, are all well recognized, used and relied upon by the defendants themselves, by the other members in the pharmaceutical industry, by investors, by economists, and by previous antitrust actions in federal courts.

88.     Defendants made studies based upon the recognition of a market of pharmaceutical products in general, and prescription and brand name pharmaceutical products in particular.

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

89.     The overall pharmaceutical market is used and relied upon by Fortune Magazine, the leading periodical used and relied upon by the businesses in the United States.

90.     The prescription drug market is used and relied upon by Dun & Bradstreet, an entity used and relied upon by all major businesses in the United States.

91.     The brand name prescription drug market is utilized and relied upon by IMS Health (NYSE: RX), the world's leading provider of market intelligence to the pharmaceutical and healthcare industries.

92.     In all of these defined markets, Pfizer and Wyeth rank in the top five.

93.     In the prescription drug market, they are first and second.

94.     In its annual rankings of the top pharmaceutical companies in the United States, Fortune Magazine, May 5, 2008, ranked Pfizer and Wyeth as numbers two and three in the industry.

95.     The leading trade association in the industry, Pharmaceutical Research and Manufacturing Association (PhARMA), restricts its membership to brand name prescription drug innovators, manufacturers, and sellers.

96.     PhARMA bases its dues on the percentage of the market of its members based upon the revenues from the manufacture and sale of pharmaceutical products.  Pfizer and Wyeth are recognized by their peers as in the top five companies in the pharmaceutical product market.

97.     The market share is determined on the basis of the revenues of all pharmaceutical products in the pharmaceutical industry.

98.     Through this association, the CEO's of defendants and other members of the market meet at least once a month to discuss industry problems, prices, products, and research.

99.     Brand name prescription drugs are also marketed differently from other products.

100.    Because only licensed doctors can write prescriptions, which are necessary to purchase defendants' products, the industry marketing is particularly focused on the doctors and the hospitals where doctors congregate.

101.    In this marketing, the defendants advertise extensively in medical journals, such as the Journal of The American Medical Association, that are tailored to the doctor.

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

1      102.    In addition, detail men visit the individual doctors and hospitals to provide free

2    literature, product, promotions and gratuities.

3      103.    In all of this marketing, the defendants focus on their ability to offer a broad range

4    of pharmaceutical products for a wide variety of illnesses and ailments.

5      104.    Pfizer and Wyeth are significant rivals, actual and potential, in the manufacture,

6    sale and innovation of pharmaceutical products.

7      105.    The behavior of each is therefore constrained by actual and potential competition

8    from the other throughout each and all of the relevant markets.

9      106.    The manufacture, sale and innovation of pharmaceutical products by Pfizer and

10   Wyeth exist in interstate commerce, make extensive use of the instrumentalities of interstate

11   commerce, and substantially affect interstate commerce.  Any restraint or possible or probable

12   restraint on competition by Pfizer and Wyeth substantially affects the interstate and foreign

13   commerce of the United States.

14     107.    Materials used in the manufacture of each of the products manufactured and sold

15   by Pfizer and Wyeth are purchased in a continuous and uninterrupted flow of interstate

16   commerce.

17     108.    The past fifteen years have included increasing concentration in the relevant

18   markets with at least 15 mergers and acquisitions of competitors, among them two by Pfizer and

19   one by Wyeth.

20     109.    The mergers and acquisitions include the following: (1) Roche Holding ltd and

21   Genentech, Inc.; (2) AstraZeneca PLC and Medimmune, Inc.; (3) Merck KGgA and Serono SA;

22   (4) Bayer AG and Schering AG; (5) Novartis AG and Chiron Corporation; (6) Sanofi-Synthelabo

23   and Aventis; (7) Pfizer, Inc. and Pharmacia Corporation; (8) Johnson & Johnson and ALZA

24   Corporation; (9) Glaxo Wellcome pic and SmithKline Beecham pic; (10) Pfizer and Warner-

25   Lambert Company; (11) Zeneca Group plc and Astra AB; (12) Sanofi SA and Synthelabo SA;

26   (13) Sandoz AG and Ciba-Geigy AG; (14) Glaxo plc and Wellcome plc; and (15) Wyeth and

27   American Cyanamid Company.

28

.

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

1         110.    The defendants' combination will not only continue this trend, but will encourage

2    others to merger out of a professed concern to be able to compete with the defendants' merged

3    company.  At the same time as this combination, one of the largest pharmaceutical companies,

4    Merck, purchased another of the largest pharmaceutical companies, Schering-Plough.  The trend

5    toward concentration by these huge combinations substantially lessen competition and tend to

6    create a monopoly in the manufacture, sale and innovation of pharmaceutical products.

7         111.    The innovation market consists of the research and development directed towards

8    particular new or improved goods or process, and the close substitutes for that research and

9    development.

10        112.    In 2008 Pfizer spent $7.9 Billion on research and development, while Wyeth spent

11   $3.4 Billion on research and development in the same year.  At the same time, the industry spent

12   $38.4 Billion on research and development, according to the PhARMA Annual Membership

13   Survey, 2009.

14        113.    Thus the defendants accounted for $11.3 Billion of the $38.4 Billion or over 25%

15   of industry research and development spending in the United States.

16        114.    According to one study reported in Business Week, Drug Mergers are Killers of

17   Research. "These mergers tend to have a negative effect on R&D culture in general."

18        115.    The combination of defendants ended competition between them in all of the

19   innovation markets.

20        116.    Because of defendants' size, and their combined power once they have merged,

21   other actual and potential competitors will be deterred from competing with defendants in these

22   innovation markets, with consequent harm both to competition and to consumers.

23        117.    The combination has a dominant position in the market, with the ability to raise

24   prices, create a price umbrella, and deter competition from smaller rivals.

25        118.    Because of defendants' size, and their combined power once they have merged,

26   other actual and potential competitors will be deterred from competing with the defendants in the

27   manufacture, sale and innovation of pharmaceutical products, with consequent harm both to

28   competition and to consumers.

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

119.    The combination has a dominant position in the market, with the ability to raise prices, create a price umbrella, and deter competition from smaller rivals once a product has been developed.

120.    Because of defendants' size, and their combined power once they have merged, other actual and potential competitors will be deterred from competing with defendants in the innovation market for the development of brand name prescription drugs, with consequent harm both to competition and to consumers.

121.    There are significant barriers to entry in each of the relevant markets, as well as a history of a lack of successful new entry.

122.    According to Tufts Center for the Study of Drug Developments, the average cost of developing a new prescription drug is $897 Million.

123.    New entry into the relevant markets cannot be timely, likely, or sufficient to deter or counteract the anticompetitive effects of the defendants' merger.

124.    New entry into the relevant markets is a difficult process because of, among other things, the time and cost associated with researching and developing the products, obtaining approval to market the products from the United States Food and Drug Administration in the case of pharmaceutical products, or the United States Department of Agriculture in the case of biological products, and gaining customer acceptance.

125.    As a result, new entry into any of these markets sufficient to achieve a significant market impact within at least two years is unlikely.

126.    Expansion by smaller competitors into the relevant markets would also not be timely, likely, or sufficient to deter or counteract the the anticompetitive effects of the defendants' merger.

127.    The anticompetitive effects of the defendants' combination in the pharmaceutical market and the submarkets is (a) the elimination of actual, direct, and substantial competition between defendants for the sale or development of each of the relevant products in the United States; (b) an increase in the likelihood that the merged entity will exercise market power unilaterally in the United States market for each of the relevant products; (c) an increase in the

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

1  likelihood and degree of coordinated interaction between or among suppliers in the United States

2  markets for each of the relevant products; (d) a decrease in the merged entity's incentives  to

3  pursue further innovation in the United States market for each of the relevant products; and (e) an

4  increase in the likelihood that United States customers will be forced to pay higher prices for

5  each of the relevant products.

6       128.    By reason of defendants' combination, the plaintiffs are threatened with loss or

7  damage in the form of higher drug prices, reduced choice, and lower quality.

8       129.    The conduct of defendants described hereinabove, specifically their combination,

9  constitutes a violation of Section 7 of the Clayton Act, 15 U.S.C. Section 18, in that the effect of

10  the proposed merger of defendants may be substantially to lessen competition, or to tend to create

11  a monopoly in the relevant markets alleged herein, by reason of which violation the plaintiffs are

12  threatened with loss or damage in the form of higher prices, such that plaintiffs are entitled to

13  bring suit under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. Sections 15, 26, for an

14  order of divestiture requiring the defendants to unwind their merger, for damages caused by

15  increases in prices of the defendants' pharmaceutical products, and plaintiffs' cost of suit, and a

16  reasonable attorney's fee.

17       130.    The conduct of defendants described hereinabove, specifically their combination,

18  constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. Section 1, in that defendants'

19  combination constitutes an agreement and combination that unreasonably restrains trade in the

20  relevant markets alleged herein, by reason of which violation the plaintiffs are threatened with

21  loss or damage in the form of higher prices, such that plaintiffs are entitled to bring suit under

22  Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. Sections 15, 26, for an order of

23  divestiture requiring the defendants to unwind their merger, for damages caused by increased

24  prices charged by the defendants for their pharmaceutical products, plaintiffs' cost of suit, and a

25  reasonable attorneys fee.

26  / / /

27  / / /

28  / / /

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

WHEREFORE, plaintiffs demand the following from this Honorable Court:

A.      Declaring, finding, adjudging and decreeing that the merger and agreement of the defendants to merge violate Section 7 of the Clayton Antitrust Act, Section 18, and Section 1 of the Sherman Act, 15 U.S.C. Section 1.

B.      A final judgment of divestiture requiring defendants to unwind their merger and permanently enjoining them from merging in the future.

C.      A preliminary injunction requiring during the pendency of this action,

(1)  that the defendants hold separate and not commingle their two businesses that have been combined pursuant to their merger, so that divestiture may be expeditiously and effectively accomplished following trial on the merits and judgment in plaintiffs' favor;

(2)  that persons engaged in the pricing of products at Pfizer and Wyeth prior to their merger be enjoined from communicating with each about prices during the pendency of this action;

(3)  that persons engaged in the marketing of products at Pfizer and Wyeth prior to their merger be enjoined from communicating with each about marketing during the pendency of this action; and

(4)  that defendants and their merged company be enjoined from firing, discharging, laying off, or otherwise curtailing the employment of any person as a result of the defendants' merger, including, but not limited to, persons occupying the approximately 20,000 positions defendants have previously announced they plan to eliminate pursuant to their merger.

D.      Judgment awarding plaintiffs such damages, trebled, as they show themselves to have sustained during the pendency of defendants' merger prior to an order of divestiture.

E.      Awarding to plaintiffs their costs of suit, including a reasonable attorney's fee, as provided by Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. Sections 15, 26;

/ / /

/ / /

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

1         F.     Granting plaintiffs such other and further relief to which they may be entitled

2    and which the Court finds to be just and appropriate.

3    DATED:  January 8, 2010             Respectfully submitted,

4

5

6                               By:  */s/*Joseph M. Alioto
                                Joseph M. Alioto

7                               ALIOTO LAW FIRM

8                               Joseph M. Alioto (SBN 42680)
                           555 California Street, Suite 3160

9                               San Francisco, CA  94104
                           Telephone:  (415) 434-8900

10                              Facsimile:  (415) 434-9200

11                              Email:  jmalioto@aliotolaw.com

12                              *Attorney for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

.

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*

1

**PLAINTIFFS' COUNSEL**

2

ALIOTO LAW FIRM
Joseph M. Alioto, SBN 42680
555 California Street, Suite 3160
San Francisco, CA 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email: esexton@aliotolaw.com
Email: tdmooreesq@aol.com

LAW OFFICE OF JAMES M. DOMBROSKI
James M. Dombroski, SBN 56898
P.O. Box 751027
Petaluma, CA 94975
Telephone: (707) 762-7807
Facsimile: (707) 769-0419
Email: jdomski@aol.com

LAW OFFICES OF JOHN H. BOONE
John H. Boone, SBN 44876
555 California Street, Suite 3160
San Francisco, CA 94104
Telephone: (415) 434-1133
Facsimile: (415) 434-9200
Email: jboone@dc.rr.com

LAW OFFICES OF JEFFERY K. PERKINS
Jeffery K. Perkins, SBN 57996
1275 Columbus Avenue
San Francisco, CA 94133
Telephone: (415) 474-3833
Facsimile: (415) 474-2890
Email: jefferykperkins@aol.com

GRAY, PLANT, MOOTY, MOOTY &
BENNETT
Daniel R. Shulman, MNBN 100651
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 632-3335
Facsimile: (612) 632-4335
Email: daniel.shulman@gpmlaw.com

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

.

17

*Second Amended Complaint for Injunctive Relief for Violation of the Antitrust Laws of the United States*