IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOLDEN GATE PHARMACY SERVICES, INC., d/b/a GOLDEN GATE PHARMACY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PFIZER, INC., and WYETH, <br><br> Defendants / | No. C-09-3854 MMC <br><br> **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** |

Before the Court is defendants Pfizer Inc. and Wyeth's motion, filed January 22, 2010, to dismiss plaintiffs' Second Amended Complaint. Plaintiffs Golden Gate Pharmacy Services, Inc., James Clayworth, R.Ph., Marin Apothecaries, Pediatric Care Pharmacy, Inc., Tony Mavrantonis, R.Ph., John O'Connell, R.Ph., and Tilley Apothecaries, Inc. have filed opposition, to which defendants have replied. Having read and considered the papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

//

---

[1] By order filed March 11, 2010, the Court took the matter under submission. Plaintiffs' Motion to Request Oral Argument, filed March 15, 2010, is hereby DENIED for the reasons stated in defendants' opposition thereto, specifically, that all parties have had an adequate opportunity to submit their respective arguments in writing. See, e.g., Partridge v. Reich, 141 F.3d 920, 926 (9th Cir. 1988) (holding, in context of motion for summary judgment, "a district court can decide the issue without oral argument if the parties can submit their papers to the court").

**BACKGROUND**

In their Second Amended Complaint ("SAC"), plaintiffs allege that each defendant is "engaged, inter alia, in the research, development, manufacture, distribution, and sale of pharmaceuticals products" (see SAC ¶¶ 11, 13), and that defendants "consummated [a] merger" on October 15, 2009 (see SAC ¶ 81). Plaintiffs further allege: "The effect of the combination may be to lessen competition or to tend to create a monopoly, and has already lessened competition and tended to create a monopoly, in numerous markets and submarkets . . . involving the manufacture and sale of pharmaceuticals and involving research, development, and innovation with respect to pharmaceuticals." (See SAC ¶ 82.) Based on said allegations, plaintiffs assert a claim against defendants under Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act, 15 U.S.C. § 1.

**LEGAL STANDARD**

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." See id. Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." See id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party. See NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). "Factual allegations

must be enough to raise a right to relief above the speculative level[.]" Twombly, 550 U.S. at 555. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." See Iqbal, 129 S. Ct. at 1950 (internal quotation and citation omitted); see, e.g., Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1047-48 (9th Cir. 2008) (holding plaintiff who alleged "only ultimate facts" and "legal conclusions," rather than "evidentiary facts," failed to state claim under Sherman Act).

**DISCUSSION**

As noted, plaintiffs allege defendants' merger violates Section 7 of the Clayton Act and Section 1 of the Sherman Act. Section 7 of the Clayton Act prohibits mergers or acquisitions "in any line of commerce or in any activity affecting commerce in any section of the country, [where] the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly." See 15 U.S.C. § 18. Section 1 of the Sherman Act provides that any "contract, combination . . ., or conspiracy, in restraint of trade or commerce" is "illegal." See 15 U.S.C. § 1.

In the SAC, plaintiffs allege that the merger has or will have "anticompetitive effects" in "the pharmaceutical market" and in "submarkets." (See SAC ¶ 127.) Defendants argue that plaintiffs have failed to sufficiently allege a product market or market.

"Antitrust law requires [an] allegation of both a product market and a geographic market." Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045 n.4 (9th Cir. 2008).[2] "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put," Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 437 (3rd Cir. 1997) (noting "while there may be some degree of preference for the one over the other,

---

[2]Plaintiffs allege that the "anticompetitive effects" of the merger will be felt "in the United States." (See SAC ¶ 127.) Defendants have not argued that plaintiffs' allegation of a nationwide market is insufficient to allege a geographic market.

3

1 either would work effectively") (internal quotation and citation omitted), while "[c]ross-
2 elasticity of demand is a measure of the substitutability of products from the point of view of
3 buyers," see id. at 438 n.6 (internal quotation and citation omitted); see also White & White,
4 Inc. v. American Hospital Supply Corp., 723 F.2d 495, 501 (6th Cir. 1983) (holding "a
5 product market is [ ] defined by 'reasonable interchangeability' as gauged by the
6 interchangeability of other products for the same use, and by consumer sensitivity and
7 response to price fluctuations among available substitutes").  In short, a cognizable product
8 market consists of "commodities reasonably interchangeable by consumers for the same
9 purposes."  See United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395
10 (1956).

11      "[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant
12 market' definition is facially unsustainable."  Newcal Indus., 513 F.3d at 1045 (citing Queen
13 City Pizza, 124 F.3d at 436-37).  "Where the plaintiff fails to define its proposed relevant
14 market with reference to the rule of reasonable interchangeability and cross-elasticity of
15 demand, or alleges a proposed relevant market that clearly does not encompass all
16 interchangeable substitute products even when all factual inferences are granted in
17 plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be
18 granted."  Queen City Pizza, 124 F.3d at 436; see, e.g., Tanaka v. University of Southern
19 California, 252 F.3d 1059, 1063-64 (9th Cir. 2001) (affirming dismissal of antitrust claims
20 where plaintiff athlete identified product market as "UCLA women's soccer program" but
21 failed to allege any facts to support "conclusory" assertion that such market existed); Big
22 Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1105 (9th Cir. 1999) (holding,
23 where plaintiffs alleged existence of "product markets for lodging accommodations and ski
24 packages" in Big Bear Valley, district court properly dismissed antitrust claims because
25 plaintiffs failed to allege "there are no other goods or services that are reasonably
26 interchangeable with lodging accommodations or ski packages within [the] geographic
27 market" of Big Bear Valley).
28 //

Here, plaintiffs, in the SAC, identify the product market(s) as follows: "Defendants Pfizer and Wyeth compete in what they describe to be the pharmaceutical industry which includes, but is not necessarily limited to, the following submarkets: manufacture, sale and innovation of all pharmaceutical products, prescription pharmaceutical products, non-prescription pharmaceutical products, brand name pharmaceutical products and particular pharmaceutical products and therapies specifically noted and identified by Pfizer and Wyeth in their annual reports." (See SAC ¶ 86.)

Plaintiffs fail to allege that all commodities sold by entities who compete in the "pharmaceutical industry" are reasonably interchangeable with one another, or that "all pharmaceutical products," all "prescription pharmaceutical products," all "non-prescription pharmaceutical products," or all "brand-name pharmaceuticals products" are reasonably interchangeable with one another. As the Court noted in its order dismissing the First Amended Complaint, with reference to plaintiffs' allegation included therein that all prescription drugs constituted a product market, the Court cannot "simply assume that all prescription drugs are reasonably interchangeable for the same purposes, such that, for example, if the price of a prescription drug used to treat osteoporosis rises, consumers may react by switching to a prescription drug used to treat Alzheimer's disease." (See Order, filed December 2, 2009, at 5:1-5.)

Plaintiffs argue that they have sufficiently alleged "interchangeability, both in the pharmaceutical product markets and in the innovation market for pharmaceutical products." (See Pls.' Opp., filed February 5, 2010, at 15:3-4.) In support of such argument, plaintiffs rely on the following allegations in the SAC:

> The prices charged by Pfizer for its pharmaceutical products has a direct effect and impact on the prices charged by Wyeth for its products, whether they are direct substitutes or not.

(See SAC ¶ 52.)

> The prices charged by Wyeth for its pharmaceutical products has a direct effect and impact on the prices charged by Pfizer for its products, whether they are direct substitutes or not.

(See SAC ¶ 53.)

> Wyeth considers the prices charged by Pfizer for pharmaceutical products when Wyeth sets its prices for its pharmaceutical products, whether they be substitute therapies or not.

(See SAC ¶ 54.)

> Pfizer considers the prices charged by Wyeth for pharmaceutical products when Pfizer sets its prices for its pharmaceutical products, whether they be substitute therapies or not.

(See SAC ¶ 55.)

The above allegations, construed in the light most favorable to plaintiffs and assumed true at the pleading stage, would support a finding that, for example, the price Wyeth charges for a product intended for use to treat depression has some type of effect on the price charged by Pfizer for products intended for use to treat renal-cell carcinoma, or, as another example, a finding that before Wyeth, in determining the price at which Wyeth will sell a product intended for use to treat depression, first considers the price at which Pfizer is selling products that are intended for use to treat renal-cell carcinoma. Plaintiffs fail to allege, however, that any such pricing considerations have any bearing on consumer behavior, e.g., that a consumer who seeks to purchase a product for use to treat depression will react to a price change by purchasing a product used to treat renal-cell carcinoma. See United States v. General Dynamics Corp., 341 F. Supp. 534, 555 (N.D. Ill. 1972) ("Any definition of a line of commerce which ignores the buyers and focuses on what the sellers do, or theoretically can do, is not meaningful."), aff'd, 415 U.S. 486 (1974). Consequently, the Court finds the above-quoted allegations on which plaintiffs rely are insufficient to support a finding that "all pharmaceutical products," all "prescription pharmaceutical products," all "non-prescription pharmaceutical products," and all "brand name pharmaceutical products" constitute cognizable product markets for purposes of plaintiffs' antitrust claims. See Apple Inc. v. Psystar Corp., 586 F. Supp. 2d 1190, 1196 (N.D. Cal. 2008) ("Whether products are part of the same or different markets under antitrust law depends on whether consumers view those products as reasonable substitutes for one another and would switch among them in response to changes in relative prices[.]");

As noted, plaintiffs, in the SAC, also identify, as a product market or markets, "particular pharmaceutical products and therapies specifically noted and identified by Pfizer and Wyeth in their annual reports." (See SAC ¶ 86.) The SAC does not state, however, what "particular" products or therapies were so identified in defendants' respective annual reports. In any event, plaintiffs fails to allege that any such products or therapies are, from the point of view of the buyers thereof, reasonably interchangeable. Consequently, plaintiffs' conclusory reference to the existence of "particular pharmaceutical products and therapies" is insufficient to allege a cognizable product market or markets. See Queen City Pizza, 124 F.3d at 436 (holding where "plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," complaint is subject to dismissal).[3]

To the extent plaintiffs allege there exists or existed "actual or potential competition between Pfizer and Wyeth" with respect to various "products," such allegations likewise are insufficient to plead a claim. In connection with such allegation, plaintiffs list the following: "'other primary' pharmaceutical products"; "'urological' products"; "'central nervous system' products"; "'cardiovascular' products"; "'capsugel' products"; "'oncological' products"; "'animal health' products"; "'consumer' products"; "'nutritional' products"; "'inflammation' products"; "'infectious disease' products"; and "'other specialty' products." (See SAC ¶¶ 39-50.)[4] No further allegations concerning any such "products" are provided by

---

[3] In their First Amended Complaint ("FAC"), plaintiffs alleged that separate product markets exist for the manufacture and sale of drugs to treat Alzheimer's disease, renal-cell carcinoma, and Methicillin-resistant Staphylococcus aureus infections (see FAC ¶¶ 17(f), 17(h)-(i), 27-28), for the research and development of new drugs to treat osteoporosis and to treat Alzheimer's disease (see FAC ¶¶ 17(e), 17(g), 29-30), for brand name antidepressants, anti-bacterials, and anti-neoplastics (see FAC ¶¶ 17(j)-(l), 24-26), and for the manufacture and sale of drugs to treat specified animal diseases or conditions, such as "canine monovalent vaccines for the prevention and treatment of disease caused by parvovirus" and "equine tapeworm parasiticides containing praziquantel" (see FAC ¶¶ 21(m), 31, Ex. A ¶ 7). Plaintiffs, however, did not include such allegations in the SAC, and, consequently, the Court does not consider whether such alleged product markets would be cognizable.

[4] Plaintiffs attribute the descriptions of such products, e.g., "other primary," "capsugel," and "nutritional," to Pfizer. (See SAC ¶¶ 39, 43, 47.) Plaintiffs do not allege the circumstances under which, or the context in which, such descriptions were used.

7

1 plaintiffs, and, again, plaintiffs fail to allege that the goods included within any such
2 described category, e.g., all "'consumer' products" or all "'infectious disease' products," are
3 reasonably interchangeable by buyers. Accordingly, such references in the SAC, if
4 intended by plaintiffs to identify product markets or submarkets, are insufficient to state a
5 claim.

6 Finally, plaintiffs argue that if the Court were to find the instant pleading is subject to
7 dismissal, such a ruling would run counter to five Supreme Court decisions, each of which
8 decisions, according to plaintiffs, "enjoined a merger where the market share pales in
9 comparison to the market share at issue in defendants' merger." (See Pls.' Opp. at 23:14-
10 15.) As defendants correctly observe, however, the issue of "market share" can only be
11 addressed after a cognizable product market has been identified. See United States v. E.
12 I. du Pont de Nemours & Co., 353 U.S. 586, 593 (1957) ("Determination of the relevant
13 market is a necessary predicate to a finding of a violation of the Clayton Act because the
14 threatened monopoly must be one which will substantially lessen competition 'within the
15 area of effective competition.' Substantiality can be determined only in terms of the market
16 affected.").

17 Indeed, to the extent the cases cited by plaintiffs address the issue of product
18 market, the Supreme Court, before considering whether the merger at issue therein should
19 have been enjoined, first identified the alleged product market, and then considered
20 whether the commodities or services at issue were reasonably interchangeable by the
21 purchasers of such commodities or services. See United States v. Aluminum Co. of
22 America, 377 U.S. 271, 276-77 (1964) (finding relevant product market consisted of both
23 "bare and insulated aluminum conductor products," where "[b]oth types [were] used for the
24 purpose of conducting electricity and [were] sold to the same customers, electrical
25 utilities"); United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 335 (1963) (finding
26 personal loans provided by "small-loan companies" and personal loans provided by
27 "commercial banks" were not reasonably interchangeable, because "small-loan companies'
28 rates are invariably much higher than the banks"); Brown Shoe Co., 370 U.S. at 297-99,

326 (affirming district court's finding that, when examining propriety of merger between manufacturers of shoes, relevant "lines of commerce" were "product lines" of men's, women's and children's shoes, as opposed to "footwear" or "shoes as a whole").[5]

In sum, plaintiffs have failed to sufficiently allege the existence of a cognizable product market, because plaintiffs have failed to allege, even as a legal conclusion, let alone with the requisite "evidentiary facts," see Kendall, 518 F.3d at 1047-48, that any of the alleged markets or submarkets identified in the SAC consists of products reasonably interchangeable by consumers. Consequently, the SAC is subject to dismissal. See id. at 1045 (holding antitrust complaint subject to dismissal where "complaint's 'relevant market' definition is facially unsustainable"); Queen City Pizza, 124 F.3d at 436 (holding "relevant market is legally insufficient and a motion to dismiss may be granted," where "plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand").

**CONCLUSION**

For the reasons discussed above, defendants' motion to dismiss the Second Amended Complaint is hereby GRANTED, and the Second Amended Complaint is hereby DISMISSED.

The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: April 16, 2010

MAXINE M. CHESNEY
United States District Judge

---

[5]The other two Supreme Court cases on which plaintiffs rely contain no discussion with respect to the product markets identified therein. See United States v. Pabst Brewing Co., 384 U.S. 546, 548 (1966) (noting plaintiff had alleged merger at issue would have anti-competitive effect in market for "the production and sale of beer," and deciding whether plaintiff had established geographic market); United States v. Von's Grocery Co., 384 U.S. 270, 271, 278 (1966) (deciding, where market identified as "retail grocery market in the Los Angeles area," whether evidence demonstrated "competition would [ ] be destroyed" if merger not enjoined).